# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LINDA REED,

                    Plaintiff,

v.                                                      Case No. 14-CV-330-JPS

COLUMBIA ST. MARY'S HOSPITAL,

                    Defendant.                          **ORDER**

## 1.      INTRODUCTION

Plaintiff Linda Reed ("Reed") suffers from several disabilities, including tardive dyskinesia ("TD") and bipolar disorder. Her TD makes it difficult for her to speak, so she often uses a computer-based communication device. In March 2012, she sought treatment at Defendant Columbia St. Mary's Hospital ("Columbia") because she was feeling suicidal. In this lawsuit, she asserts that during her four-day stay, Columbia staff discriminated against her on the basis of her disabilities and refused to make adequate accommodations for her impairments.

She brings claims for violations of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. She also asserts several claims arising under the Wisconsin Mental Health Act, Wis. Stat. § 51.61, for violations of her rights as a medical patient. Columbia filed a motion for summary judgment on October 14, 2016. (Docket #49). Columbia seeks dismissal of all of Reed's federal claims. First, it argues that it enjoys a religious exemption from liability under the ADA. Second, it asserts that there is inadequate evidence to show that it discriminated against Reed solely based on her

disabilities, as is required to sustain a claim under the Rehabilitation Act. Finally, Columbia requests that the Court decline to exercise supplemental jurisdiction over the remaining state-law claims. Reed opposed Columbia's motion and filed a motion to strike Columbia's religious exemption defense, contending that it had not been timely asserted. (Docket #54 and #55).[1] The parties' motions are fully briefed and, for the reasons stated below, the Court must grant Columbia's motion and dismiss this action.

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir.

---

[1]Reed also filed a motion to strike the entirety of Columbia's motion for summary judgment on the ground that it did not state with particularity the relief sought, in violation of Federal Rule of Civil Procedure 7(b). (Docket #51); Fed. R. Civ. P. 7(b). Reed does not explain precisely what is deficient in Columbia's motion, and the Court finds no ambiguity in Columbia's request that her suit be dismissed. Perhaps Reed is complaining about Columbia's decision not to file a motion separate from its memorandum in support? She does not say, and the Court does not view that decision as a violation of Rule 7(b). *See Talano v. Northwestern Med. Faculty Found., Inc.*, 273 F.3d 757, 761 (7th Cir. 2001) (finding that vague allegations of error violate Rule 7(b)'s particularity requirement). Moreover, the sanction she requests is extreme in comparison to the alleged violation. Thus, the Court will deny Reed's motion.

2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [her] case is convincing, [she] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3.      **RELEVANT FACTS**

   3.1     **Reed's Treatment at Columbia**

Reed suffers from TD, bipolar disorder, post-traumatic stress disorder, and acute anxiety. (Docket #55 ¶ 11). TD is a neurological disorder that substantially limits a person's ability to speak and swallow due to uncontrollable, involuntary movements in the mouth, limbs, and hands. To cope with the disease, Reed uses various communication techniques and aids, including a computer-based communication device called a Dynavox. *See* (Docket #37 ¶ 9).

Reed entered the Columbia emergency department in mid-afternoon on Thursday, March 8, 2012, reporting suicidal thoughts. (Docket #55 ¶ 11). She was admitted for treatment to Columbia's inpatient behavioral health unit. *Id.* She remained there until her discharge on the morning of Monday, March 12, 2012. *Id.* ¶ 12; *see also* (Docket #59 ¶ 36).

While being treated at Columbia, Reed claims she was subjected to discrimination because of her disabilities. First, Columbia staff would repeatedly refuse to give her the Dynavox when she asked for it, including during her discharge meeting on March 12, 2012. (Docket #37 ¶ 13); (Docket

#55 ¶¶ 17, 24). (The Dynavox was held at the nurse's station at night in order to recharge its batteries.)

Second, she says she was prescribed psychotropic medication despite telling Columbia staff that she is allergic to it. (Docket #37 ¶ 14). She refused to take it when offered. *Id.* At times, she asked to see her medication records so she could determine whether she was being given any such medications, but these requests were refused. *Id.* ¶¶ 14, 23; (Docket #55 ¶ 13). Third, she was repeatedly denied use of the telephone to call her "case manager." (Docket #37 ¶ 21). Fourth, she was denied access to the hospital chaplain. (Docket #55 ¶ 22). Finally, she was escorted off the hospital grounds by two security guards after the March 12 discharge meeting. *Id.* In her original complaint, she claimed that the guards injured her, but the amended complaint omits such allegations. *See id.*; *see also* (Docket #55-26 at 3–5).

The record reveals that Reed's stay at Columbia was fraught with difficulty and punctuated by confrontations between her and the staff. *See* (Docket #55-11 at 21) (examination note stating that Reed was discharged for "behavior issues" and was "sent away by staff"). At the intake interview on March 8, 2012 with psychiatrist Dr. Eric Kaplan ("Dr. Kaplan"), she was "angry and agitated" and in a "manic state"—so much so that Dr. Kaplan had to leave the intake interview and another doctor completed it later. *See id.* at 46, 83–84. It was also noted by a nurse that at intake, Reed communicated in "explosive verbal volleys" along with using her Dynavox. *Id.* at 100.

Additionally, throughout her stay, Reed refused some of Columbia's treatment recommendations, including certain medications on her stated fear that she was allergic to them. (Docket #55-22 at 2 ¶ 3); (Docket #55 ¶ 75); (Docket #55-11 at 24) (progress note that Reed was "all over the map, refuses

to take any psych meds"); *see also* (Docket #55-13 at 30–31) (May 30, 2013 note from Dr. Kathryn Gaines, who treated Reed for over a decade, that Reed visited her in a disturbed stated and refused to take her medication). Although Reed claims that she was prescribed psychotropic drugs at Columbia after warning the staff of her allergy, there is no evidence that she was ever administered such medications, only that she was concerned about the possibility. (Docket #55 ¶ 76); (Docket #59 ¶¶ 75–76); *but see* (Docket #55-11 at 17) (March 8, 2012 note showing order for psychotropic medications). In any event, she claims she refused all such medications when they were offered to her. (Docket #59 ¶ 75); (Docket #55-11 at 34). Similarly, while she asserts that she was not allowed to see her medication records, (Docket #59 ¶ 77), Donna Taylor, Director of Risk Management at Columbia, later explained to her that this was due to Columbia policy, which provides that a patient can review her records after discharge, (Docket #55-22 at 1). The right to review records is not, as Reed believed, an unfettered right to see all such records immediately upon request. *See id.*

Further, she was often disruptive, loud, agitated, and could not easily be understood in her speech as a result of her TD. *See* (Docket #55-11 at 34) (Reed describing her disabilities as "noisy"); *id.* at 35 (Reed writing that on one occasion, she became "spooked" and "los[t] control over [her] disorder"); *id.* at 42 (progress note that Reed exhibited bipolar disorder with "severe mania"); *id.* at 85 (progress note that Reed became "distraught" in the afternoon on March 10 and was "unable to speak"); *id.* at 86 (progress note that Reed's mood was "up and down all shift" late on March 11). Her behavior was so hard to control that the nursing supervisor, William Fry ("Fry"), testified that staff would only provide Reed her Dynavox "if her behavior was appropriate." (Docket #55 ¶¶ 62–64); (Docket #59 ¶ 64). There

is also evidence that she became belligerent when counseled about appropriate behavior during group therapy sessions and while she was being escorted out of the hospital at discharge. (Docket #55-22 at 3 ¶ 7, 4 ¶ 13); (Docket #55-11 at 86–87).

Andrew Miller ("Miller"), a Columbia patient care assistant, witnessed the incident which is the central feature of this case. (Docket #55 ¶ 38). Early in the morning on Sunday, March 11, 2012, Miller was seated at the nurse's station in the behavioral health unit. *Id.* Reed approached him and asked for her Dynavox, which was charging at the nurse's station. *Id.* This request was apparently denied for reasons not explained by the parties. *Id.* Reed then walked into the dining room, which faced the nurse's station, to get a napkin on which to write Miller a note. *Id.* Reed contends that the note contained a request to speak with her case manager, whom she had been trying to contact for several days. *See id.* Miller then observed Reed walk out of the dining room, sit on the ground, and begin to cry. *Id.* Reed told Miller that she needed help. *Id.*

Miller claims that Reed refused to move although he explained several times that she needed to return to her room so that the nurses could help her. *Id.* ¶¶ 38–45. During this time, she was screaming so loudly that other patients came out of their rooms to see what the commotion was. *Id.* He decided that she was not going to move voluntarily, so he helped her stand. *Id.* At this, she screamed at Miller, asking him to stop, but he responded that she could not stay in the middle of the floor, that she was causing a disturbance, and that the nurses could help her once she was back inside her room. *Id.*

According to Miller, Reed's screaming continued at such a volume that the nurses came out of their morning meeting as he was escorting her to her

room. *Id.* ¶¶ 46–51. Fry, who was at the meeting, directed Miller to take Reed to a "seclusion" room instead of her own room. *Id.* Fry helped Miller walk Reed to this room, and she did not resist. *Id.* They then lowered her gently to the bed on the floor. *Id.* She remained in the room, which was unlocked and open, for two hours. *Id.* Fry claims that Reed was never placed in forced isolation. *Id.*

Reed tells the story differently.[2] She claims that after Miller initially denied her request for her Dynavox, she went to the dining room, wrote a note about contacting her case manager, and obtained a cup of coffee. *Id.* ¶¶ 38–45. She then returned to the nurse's station and, as she tried to pass Miller her note, her TD caused her to spill hot coffee on herself. *Id.* She fell to the floor in pain. *Id.* She admits that Miller then told her "that she could not stay in the middle of the floor." *Id.* ¶ 43. At some point, Miller yelled, "that's it!", grabbed Reed, and took her to an "isolation" room. *Id.* According to Reed, Miller threw her on a mattress on the floor of the room and left. *Id.*; *see also* (Docket #59 ¶¶ 42–44). She claims she was "never violent during the entire incident," though she never denies that she was on the floor or that she was crying out during the incident. (Docket #55 ¶ 43); (Docket #55-11 at 30) (Reed

---

[2]Reed's version of events is based almost exclusively on an online complaint about her experience at Columbia she purportedly filed with the Wisconsin Department of Health Services in July 2012. (Docket #55-26); (Docket #59 ¶ 1). Defendant disputes the foundation for the document, claiming it was never produced in discovery despite being responsive to its requests for production. (Docket #59 ¶ 1). Defendant requests that the document not be considered here. (Docket #56 at 5–6). The Court notes that the online complaint is not sworn. However, Reed incorporated the document by reference into her affidavit she submitted along with her opposition to Columbia's motion for summary judgment. *See* (Docket #55-25). Because the statements in the online complaint do not save Reed's claims, the Court will assume without deciding that the online complaint has a sufficient foundation and should not be stricken for its prior non-disclosure.

noting on her discharge form that she had fallen to the floor before Miller "attacked"); (Docket #59 ¶ 63) (Fry testifying that during the incident "it was impossible to understand [her] because she was really just screaming and yelling"); *see also* (Docket #52 at 22) (stating that Reed "became even more agitated" after falling to the floor).[3] Furthermore, Reed avers that Fry never participated in the seclusion incident at all. (Docket #55 ¶¶ 46–51). As for the period of segregation, Reed claims that she did not know or believe that she was free to leave the room. *Id.* In fact, she states that "[a] patient care attendant remained present outside the door" for the entire period, suggesting that he or she was ensuring that Reed stayed in the room. *See* (Docket #59 ¶ 46).

Fry testified that he chose the seclusion room for Reed to decrease her stimulation and allow her an opportunity to calm herself down. (Docket #55 ¶ 48). Reed asserts that Fry chose the seclusion room as a punitive measure without first attempting less drastic methods for de-escalating the situation, which was a violation of Columbia policy. *Id.* She also argues that Columbia's existing policies were insufficient for the situation, claiming that they were

---

[3]Reed appears to deny the entirety of Miller's and Fry's account of events in her responses to Columbia's proposed statements of fact. *See* (Docket #55 ¶¶ 38–50). Yet the 2012 online complaint she submitted, *see supra* note 2, which in most cases is the only basis for her denial, does not actually contain express denials of everything that her opponents say occurred, such as her screaming while she was on the floor. The online complaint is inadequate to dispute those facts it does not address. *See Johnson v. Shiseki*, No. 08–C–471, 2010 WL 1287037, at *2 (E.D. Wis. Mar. 29, 2010) ("To the extent that an objection to a proposed finding of fact. . .is non-responsive to the proposed finding of fact, the objection does not create a dispute of fact.") (internal citations omitted). Put differently, her online complaint could be true even though it is incomplete, and the mere fact that it does not include a particular fact does not establish that the fact is disputed. If Reed had wanted to specifically deny everything Fry and Miller say happened on March 11, 2012, she could have offered sworn statements to that effect as a supplement to the statements she made in the online complaint. She elected not to.

threadbare on how to accommodate speech-impaired patients. (Docket #59 ¶¶ 49–55).

The medical record shows that sometime later in the day on March 11, Reed expressed a desire to leave Columbia. (Docket #55 ¶ 52); (Docket #55-11 at 32–36). Columbia staff counseled her not to go, informing her that she was at a risk of experiencing worsening psychiatric symptoms and that she was a danger to herself and others. (Docket #55-11 at 33). On this advice, she rescinded her notice of intent to leave. *Id.* at 32; (Docket #55 ¶ 52).

At the discharge meeting with Dr. Kaplan on the morning of Monday, March 12, 2012, he noted that although Reed had sought help for suicidal thoughts, "from the moment she came to the ward, she has been totally uncooperative." *Id.* For instance, as noted above, at the intake interview on March 8, she "practically kicked [Dr. Kaplan] out." *Id.* Similarly, "over the weekend she signed an intent to leave [form], but then rescinded it." *Id.* Dr. Kaplan observed that there was "no reason to believe that she is acutely suicidal. At this point, [Reed] is being disruptive to the milieu and I do not think [she] would benefit from an acute inpatient hospitalization." *Id.* Reed was then discharged from Columbia's care.

### 3.2    Columbia's Ownership Structure

Columbia's complex chain of ownership is relevant to its religious exemption defense to Reed's ADA claims, and so the Court must describe it in some detail. To better illustrate the parties' competing views on the matter, the Court will first set out Columbia's account of that structure, then describe Reed's challenges to it.

On June 30, 2011 the Congregation of Consecrated Life and Societies of Apostolic Life of the Vatican (the "Congregation") conferred public juridic

personality on Ascension Health Ministries. *Id.* ¶ 16.[4] Ascension Health Ministries, in turn, was empowered to "carry out its apostolic works through various civil entities and primarily through Ascension Health, a Missouri non-profit corporation." *Id.* ¶ 17. The governing documents of Ascension Health Ministries provide that it would be governed in accordance with canon law and that its mission would be "to further the healing ministry of Jesus Christ with special attention to those persons who are poor and vulnerable." *Id.* ¶¶ 18, 20. To do this, it would serve as "canonical sponsor" of subsidiaries which would in turn provide healthcare services. *Id.*

Ascension Health Ministries is subject to and accountable to the Congregation. *Id.* ¶ 19. It must submit an annual report to the Congregation which provides evidence that the integrity of faith and morals is preserved and that its apostolic activity is in accord with the Congregation's purposes. *Id.* Its 2011 report confirms that it is a ministry of the Catholic Church. *Id.* ¶ 25. Seven of the eleven members of Ascension Health Ministries for fiscal year 2012 were members of religious orders. *Id.* ¶ 20.

Ascension Health Alliance, a Missouri non-profit corporation, was formed to carry out the mission of Ascension Health Ministries. *Id.* ¶ 21. Its bylaws provide that it would be governed according to the "mission, vision, and values" of Ascension Health Ministries and "in accordance with the official teachings of the Roman Catholic Church." *Id.* ¶ 22. Ascension Health Ministries approved the creation of Ascension Health Alliance as the new parent organization for the Ascension healthcare system. *Id.* ¶¶ 23–24, 26.

Ascension Health is a Missouri non-profit and a subsidiary of Ascension Health Alliance. *Id.* ¶ 27. Its articles of incorporation (in effect at

---

[4]Columbia explains that this is the Roman Catholic Church's equivalent of creating a corporation under civil law. (Docket #49 at 5 n.3).

the relevant time) provided that it was to serve in the health ministry of the Roman Catholic Church, "to carry out its mission and ensure that the elements of Catholic identity are integrated and implemented throughout the health ministry." *Id.* At the relevant time, five members of the Ascension Health board of trustees, including the chair, were members of religious orders. *Id.*

Columbia St. Mary's, Inc., a Wisconsin non-profit corporation, is "sponsored" by Ascension Health and Columbia Health System, Inc., which is a non-sectarian community health system. *Id.* ¶ 28. Ascension Health enjoys broad powers with respect to Columbia St. Mary's, Inc., including the power to approve its mission and vision statements; approve changes to its governing documents; appoint or remove directors, including the chairman; approve transfer of assets and reallocation of debt among Columbia St. Mary's, Inc. and other Ascension Health ministries; and approve of the incurrence of debt. *Id.* ¶ 31. Columbia St. Mary's, Inc.'s bylaws provide that it will control any subsidiaries, including having the power to approve the subsidiary's mission and value statements and its governing documents; approve or remove the members of the governing board; approve the operating and capital budget of the subsidiary; and approve the subsidiary's senior executive. *Id.* ¶ 32.

Columbia (the defendant here)—whose legal name is Columbia St. Mary's Hospital Milwaukee, Inc.—was one such subsidiary of Columbia St. Mary's, Inc. *Id.* ¶ 33. Columbia is a non-profit organization whose sole corporate member is Columbia St. Mary's, Inc. *Id.* Columbia's governing documents provide that its purpose is to serve in the health ministry of the Catholic Church and carry out its mission. *Id.* ¶ 34. To that end, the ethical and religious directives of Columbia state that it "shall be and remain a

Catholic facility or institution, and shall not perform procedures or activities that are inconsistent with the Ethical and Religious Directives for Catholic Health Care Services." *Id.* Columbia was listed in "The Official Catholic Directory" for 2012. *Id.* ¶ 37.

Reed does not take issue with the broad outlines of this corporate structure. Rather, she attacks it at discrete points, noting inconsistencies in the documents submitted and instances where a particular entity is nonsectarian or controlled by lay persons. For example, she claims that, based on an Ascension webpage she accessed in November 2016, it is arguable that Ascension Health Ministries may not have existed in 2012, at least not in the form Columbia describes. *Id.* ¶¶ 16–17. Although she does not thoroughly explain her point, the Court gathers that this would, in Reed's view, defeat the notion that Ascension Health Ministries oversaw Ascension Health Alliance and used it to carry out Ascension Health Ministries' Catholic mission. *See* (Docket #59 ¶¶ 26–28).

Next, she contends that Ascension Health Ministries' 2011 report to the Congregation is not a credible source for information about its religious identity. (Docket #55 ¶¶ 19–20). According to Reed, the report submitted by Columbia was drafted by an entity other than Ascension Health Ministries and was in fact drafted for Ascension Health Alliance. *Id.* She also states that "annual reports are not governing documents and are usually drafted, edited, and produced by staff members or outside contractors who may not be assumed to understand the intricate relationships among the corporate and governance structures referenced." *Id.* She submitted no evidence that this report was drafted by an uninformed staff member or contractor.

Further, Reed contends that under its bylaws in effect at the time of her treatment, Ascension Health had only one corporate member, Ascension

Health Alliance, which was not itself a religious order. (Docket #59 ¶¶ 17–22). Before that time, Ascension Health had corporate members that were religious orders. *Id.* ¶ 19. She also asserts that Ascension Health Alliance exercised essentially complete control over Ascension Health. *Id.* ¶¶ 23–25. Columbia rejoins that Ascension Health and Ascension Health Alliance had several board members who were members of religious orders. *Id.* ¶ 18. Additionally, Ascension Health Alliance's parent, Ascension Health Ministries, had members of religious orders in seven of its eleven board seats. *Id.* ¶ 22.

Of critical importance to Reed is the involvement of Columbia Health System, Inc. in this governing structure. Columbia Health System, Inc., was a co-sponsor, along with Ascension Health, of Columbia St. Mary's, Inc.. (Docket #59 ¶ 9). It is a non-profit but has no religious purpose, according to its bylaws. *Id.* In terms of governing Columbia St. Mary's, Inc., Columbia Health System, Inc. had the power to approve the sale, transfer or substantial change in use of all or substantially all of the assets of Columbia St. Mary's, Inc. or its divestiture, dissolution, closure, corporate merger, corporate consolidation, change in corporate membership or corporate reorganization; to approve Columbia St. Mary's, Inc.'s mission and vision statement; and to approve any changes to its governing documents, or those of Columbia, that would affect Columbia Health System, Inc.'s interest in Columbia St. Mary's, Inc., or its rights under its affiliation agreement. *Id.* ¶ 11.

Reed also emphasizes that Columbia St. Mary's, Inc.'s bylaws state that it "shall not be a Catholic facility or institution, but will not perform procedures that are inconsistent with the Ethical and Religious Directives for Catholic Health Care Services as approved. . .by the United States Conference of Catholic Bishops." *Id.* ¶¶ 4–7. Under its bylaws, it does not have an

express religious purpose. (Docket #50-21 ¶¶ 1.2, 1.3, 1.4). Nevertheless, Columbia's bylaws state that it "will respect the nonsectarian traditions and values of Columbia Health System, Inc. ("CHS") and the statements of Mission, Vision and values of Ascension Health in accordance with the official teachings of the Roman Catholic Church and the Ethical and Religious Directives for Catholic Health Care Services[.]" (Docket #50-20 ¶ 1.2). Further, one of its central roles is "[t]o serve in the health ministry of the Roman Catholic Church and carry out its mission." *Id.* ¶ 1.3-a.[5] Reed claims that Columbia and Columbia St. Mary's, Inc. had the same board of directors, but, as Columbia points out, the evidence she cites—a pamphlet prepared for distribution to the public on Columbia's website—does not establish this. (Docket #59 ¶ 4). However, Columbia does admit that it and Columbia St. Mary's, Inc., had the same senior executive and that this person executed their amended bylaws that were in effect in March 2012. *Id.* ¶ 6.

4.      **ANALYSIS**

As noted above, in her amended complaint, Reed brings claims for violations of Title III of the ADA, Section 504 of the Rehabilitation Act, and the Wisconsin Mental Health Act. Columbia claims exemption from the requirements of the ADA because it is controlled by a religious organization. It also asserts that it did not discriminate against Reed solely on the basis of

---

[5]Reed also attempts to show that Columbia Center Birth Hospital, a hospital owned by Columbia St. Mary's, Inc., performs contraceptive operations like vasectomies, in violation of Catholic doctrine. *See* (Docket #59 ¶¶ 14–16). She does not explain why the operations of that facility are relevant here, nor does she draw a competent evidentiary chain between that hospital and those who control Columbia. For example, Columbia St. Mary's, Inc. does not list this entity in its bylaws as one which it controls. (Docket #50-21 ¶ 1.4-c). The Court does not find Reed's evidence on this point—an image of a webpage captured in November 2016—to be competent evidence on the question of Columbia's organizational affiliations in March 2012. *See* (Docket #55-7).

her disability, thereby undermining her Rehabilitation Act claims. Finally, Columbia urges that in the absence of viable claims under federal law, the Court should decline to exercise supplemental jurisdiction over her remaining state-law clams. The Court will discuss each argument in turn.

### 4.1    Religious Exemption Under the ADA

Title III of the ADA forbids discrimination against disabled individuals in places of public accommodation. 42 U.S.C. § 12182(a); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). However, the ADA does not apply to "religious organizations or entities controlled by religious organizations." 42 U.S.C. § 12187. Columbia claims that it is controlled by a religious institution and, as a result, enjoys immunity from ADA claims. Reed argues that Columbia waived the defense by failing to raise it in its answer. (Docket #52-1). She also asserts that disputes of fact preclude a ruling at this time as to whether Columbia qualifies for the religious exemption. (Docket #52 at 1–8).

Before reaching the merits of the defense, the Court must first determine whether Columbia has waived it. It is undisputed that Columbia formally asserted this defense for the first time in its summary judgment motion. Most affirmative defenses must be stated in a defendant's answer or they can be deemed waived. *See* Fed. R. Civ. P. 8(c). However, if an affirmative defense is not listed in Rule 8(c), it is not clear that failure to assert it in the answer waives it. *See Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 872 (7th Cir. 2012). The more appropriate inquiry in these circumstances is to inquire whether Reed suffered any prejudice from Columbia's delay in asserting the defense. *Matthews v. Wis. Energy Corp., Inc.*, 642 F.3d 565, 570 (7th Cir. 2011).

The Court finds no prejudice here. Reed claims that because of the late notice of this defense, she has had "neither fair notice of the defense nor a fair

opportunity to conduct proper discovery on the issue." (Docket #54-1 at 2).

Yet, in February 2016, six months before the close of discovery, Reed deposed one of Columbia's employees about its ownership structure. At that time, Reed learned that Columbia claimed to be a "religious organization" that was "a ministry of the Roman Catholic Church." *See* (Docket #55-8 13:13–15:20). Thus, Reed has known for a substantial period that the religious exemption defense was a possibility. She also knew upon filing the suit that she was suing a hospital at least nominally associated with the Roman Catholic faith. *See Spann v. Word of Faith Christian Ctr.*, 589 F. Supp. 2d 759, 763–64 (S.D. Miss. 2008). Further, in responding to Columbia's motion, Reed reveals that during discovery she obtained and studied the articles of incorporation and governing documents for the relevant organizations.[1] In short, she had plenty of notice and a fair chance to prepare to resist Columbia's religious exemption defense. *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005) ("The purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it."); *Venters v. City of Delphi*, 123 F.3d 956, 968–69 (7th Cir. 1997) (defense waived when raised first in summary-judgment reply and with no indication that any discovery was taken on it). Thus, the Court finds that Columbia has not waived the defense and will deny Reed's motion to strike the same.

The Court now turns to the merits of the religious exemption defense. As noted above, the ADA does not apply to "religious organizations or

---

[1] If she did not have the necessary materials for responding to the defense, she could have sought more time to respond to Columbia's motion pursuant to Rule 56(d), but she did not. Fed. R. Civ. P. 56(d)(2) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may. . .allow time to obtain affidavits or declarations or to take discovery.").

entities controlled by religious organizations." 42 U.S.C. § 12187. The statute does not define what it means to be a "religious organization" or to be "controlled" by one. *See id.* The Department of Justice, however, has explained that

> [t]he ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations. Religious organizations and entities controlled by religious organizations have no obligations under the ADA. Even when a religious organization carries out activities that would otherwise make it a public accommodation, the religious organization is exempt from ADA coverage. Thus, if a church itself operates a day care center, a nursing home, a private school, or a diocesan school system, the operations of the center, home, school, or schools would not be subject to the requirements of the ADA or this part. The religious entity would not lose its exemption merely because the services provided were open to the general public. The test is whether the church or other religious organization operates the public accommodation, not which individuals receive the public accommodation's services.
>
> Religious entities that are controlled by religious organizations are also exempt from the ADA's requirements. Many religious organizations in the United States use lay boards and other secular or corporate mechanisms to operate schools and an array of social services. The use of a lay board or other mechanism does not itself remove the ADA's religious exemption. Thus, a parochial school, having religious doctrine in its curriculum and sponsored by a religious order, could be exempt either as a religious organization or as an entity controlled by a religious order, even if it has a lay board. The test remains a factual one—whether the church or other religious organization controls the operations of the school or of the service or whether the school or service is itself a religious organization.

28 C.F.R. Part 36, App. C; *see also Chevron U.S.A., Inc. v. Natural Res. Def.*

*Council, Inc.*, 467 U.S. 837, 844 (1984) (courts should generally accord substantial deference to an executive department's interpretation of the statutes it administers).

No appellate court has yet construed Title III's religious exemption. *Cole v. St. Francis Med. Ctr.*, Case No. 1:15 CV 98 ACL, 2016 WL 7474988, at *5 (E.D. Mo. Dec. 29, 2016). However, this Court has had occasion to consider the issue. In *Rose v. Cahee*, 727 F. Supp. 2d 728 (E.D. Wis. 2010), the Court found that Agnesian Healthcare, Inc. ("Agnesian"), a not-for-profit, tax exempt healthcare corporation was covered by the religious exemption. *Id.* at 747. Several factors influenced the Court's decision. First, the religious exemption appears to be very broad, since Congress extended it not only to religious organizations but also to those entities controlled by religious organizations. *Id.* Second, an order of Catholic nuns sponsored Agnesian and occupied "a primary role in the corporation's corporate governance structure." *Id.* The order made up one class of corporate membership, and only that class had the authority to amend or repeal the corporation's articles of incorporation and bylaws. *Id.* at 747–48.

Third, while the nuns were not involved in "the daily operation and decision-making of Agnesian's individual healthcare facilities," this was insufficient to defeat the exemption. *Id.* As the Court explained,

> [a] religious organization need not directly determine the rates
> for medical services or directly engage in the hiring and firing
> of employees to control a healthcare institution. Indeed, the
> regulations specify that many religious organizations use lay
> boards and other secular mechanisms to operate social service
> entities, and that such "use of a lay board or other mechanism
> does not itself remove the ADA's religious exemption." 28
> C.F.R. Part 36, App. B. Requiring a religious organization to be
> involved in the daily operations of its social service providers
> in order to qualify for the § 12187 religious organization

> exemption undermines the intended broad application of the statute.

*Id.* at 748. Thus, Agnesian qualified for the religious exemption because it was controlled by a religious organization. *Id.*; *see also Marshall v. Sisters of Holy Family of Nazareth*, 399 F. Supp. 2d 597, 598 (E.D. Pa. 2005) (grade school operated by Roman Catholic nuns exempt when curriculum included bible study and Christian principles, and school was listed in "The Official Catholic Directory"); *White v. Denver Seminary*, 157 F. Supp. 2d 1171, 1173 (D. Colo. 2001) (seminary exempt when its purpose was to train students for Christian ministry, faculty and students required to assert a statement of religious beliefs and participate in religious curriculum, and majority of board of trustees had to be members of the Conservative Baptist Association); *Cole*, 2016 WL 7474988, at *6 (hospital exempt because it was under the jurisdiction of local Catholic diocese, "participate[d] in the health care mission of the Roman Catholic Church," was required to adhere to the "doctrine of the Roman Catholic Church," and board members and bylaws changes had to be approved by the bishop of the diocese); *but see Sloan v. Cmty. Christian Day Sch., LLC*, No. 3–15–0551, 2015 WL 10437824, at *3 (M.D. Tenn. Dec. 11, 2015) (Christian school not exempt when school was not owned, affiliated with, or financially supported by any recognized religious group but instead was owned "by a [lay] couple who felt called to start a Christian school").

This Court's decision in *Rose* controls the outcome here. Columbia has traced its lineage back to the Vatican. The corporate entities that exist in between are overseen in significant part by religious orders or members of religious orders. Those entities exercise control, one over the other, in accordance with Catholic dogma, as does Columbia itself. *See Cole*, 2016 WL 7474988, at *6. And although Columbia respects the non-sectarian traditions

of Columbia Health System, Inc., its bylaws provide that it will act in accordance with Catholic doctrine and that its mission is to serve in the health ministry of the Catholic Church. Further, Columbia was listed in "The Official Catholic Directory" for the relevant period, and it declares itself to be "a Catholic facility." *See Marshall*, 399 F. Supp. 2d at 598. Columbia is, at a minimum, a "pervasively religious organization." *White*, 157 F. Supp. 2d at 1174.

Reed's response to all of this, as described previously, is to try to poke holes in Columbia's Catholic pedigree. Throughout her submissions, Reed points to incorrect dates, missing signatures, documents that look like drafts, and webpages that suggest that certain of the entities might have existed in different forms during March 2012. *See* (Docket #55 ¶¶ 16–35). These types of disputes are trivial and generally raise only "metaphysical" doubt as to Columbia's proffered facts regarding its ownership and control. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Marshall*, 399 F. Supp. 2d at 606 (rejecting the plaintiff's attempt to "conjure a nonexistent material dispute," including that the school employs lay teachers and was not subject to the archdiocese's rules).

Reed makes more substantive challenges to Columbia's ownership, but they still fall short. First, although it is true that Ascension Health, one of the co-sponsors of Columbia St. Mary's, Inc., did not have religious orders as corporate members, members of religious orders occupied many seats on the board of trustees. Further, its parent company, Ascension Health Alliance, had members of religious orders on the board as well. Tracing back one step further reveals even more members of religious orders involved with the oversight of Ascension Health Ministries. If Reed's argument is that this is too attenuated a religious connection for Columbia to rely upon, neither the

ADA, the relevant regulations, nor the case law erect bright-line rules for the religious exemption analysis. Whether there are members of religious orders on Columbia's own board of directors is relevant, but not dispositive.

Second, Reed emphasizes Columbia's non-sectarian affiliations with her evidence regarding Columbia Health System, Inc. That entity is not itself a religious organization and is not managed by members of religious orders. In this way, Reed's case is similar to *Rose*, where the plaintiff showed that the religious entities that controlled Agnesian shared power with other corporate members. *Rose*, 727 F. Supp. 2d at 747. But as explained in the ADA's accompanying regulations, even a substantial degree of involvement of non-sectarian persons or entities is not enough to take Columbia outside the protection of Title III's religious exemption. 28 C.F.R. Part 36, App. C (the "use [of] lay boards and other secular or corporate mechanisms to operate" an entity "does not itself remove the ADA's religious exemption").

More importantly, Columbia Health System, Inc. does not exercise primary control over Columbia St. Mary's, Inc. That power lay with Ascension Health, which has direct religious oversight. Ascension Health can approve Columbia St. Mary's, Inc.'s mission statement, approve changes to its bylaws, appoint or remove its directors, including the chairman, and control major aspects of its finances. By contrast, Columbia Health System, Inc. exercises some similar powers, but only insofar as changes to governing structure or membership affect its interest in Columbia or in Columbia St. Mary's, Inc. Review of Columbia St. Mary's, Inc.'s governing documents reveals that Ascension Health undoubtedly enjoys broader powers than Columbia Health System, Inc. *See* (Docket #50-19 at 6–7). While the precise contours of each entity's control may be subject to debate, it is enough to say that the level of non-sectarian involvement in Columbia St. Mary's, Inc.'s

governance does not displace the "primary role" that the Catholic Church occupies therein. *Rose*, 727 F. Supp. 2d at 747.

Finally, the fact that Columbia St. Mary's, Inc. does not itself have a religious purpose does not undermine Columbia's religious connection. The company's bylaws speak of adherence to Catholic teachings regarding what procedures may be performed. Like its subsidiary, Columbia St. Mary's, Inc.'s respect for non-sectarian involvement in its governance does not mean that it cannot be controlled by a religious organization. The undisputed facts demonstrate that the two principles can and do operate side-by-side in this instance.

For these reasons, the Court concludes that Columbia falls within Title III's religious exemption because it is "controlled by a religious organization." 42 U.S.C. § 12187. As a result, the Court must dismiss all of Reed's claims brought pursuant to the ADA.

### 4.2    Rehabilitation Act Claims

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability. . .shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). For cases other than those involving employment discrimination, the Rehabilitation Act incorporates "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*)." *Id.* § 794a(2); *Reed v. Columbia St. Mary's Hosp.*, 782 F.3d 331, 337 (7th Cir. 2015). A plaintiff bringing a Rehabilitation Act claim can show that she was intentionally discriminated against or that the defendant failed to afford her a reasonable accommodation for her disability. *Wis. Cmty. Serv. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir.

2006); *see also Alexander v. Choate*, 469 U.S. 287, 300–01 (1985). Reed advances both theories in this case. *See* (Docket #37 ¶¶ 28–39).[2]

Yet, under either theory—and unique to claims under the Rehabilitation Act—the plaintiff must show that she was subjected to discrimination "solely by reason of" her disability. 29 U.S.C. § 794(a); *Wis. Cmty. Servs.*, 465 F.3d at 751; *Mallett v. Wis. Div. of Vocational Rehab.*, 130 F.3d 1245, 1257 (7th Cir. 1997) ("'The word *solely* provides the key: the discrimination must result from the handicap and from the handicap alone.'") (quoting *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir. 1992)). The "Rehabilitation Act forbids discrimination based on stereotypes about a handicap, but it does not forbid decisions based on the actual attributes of the handicap." *Anderson v. Univ. of Wis.*, 841 F.2d 737, 740 (7th Cir. 1988). Its purpose is to protect "handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns as. . .avoiding exposing others to significant health and safety risks." *School Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 (1987). By contrast, a claim under the ADA can be maintained if discrimination was merely a motivating factor for the defendant's action. *See Alfano v. Bridgeport Airport Servs., Inc.*, No. 04–CV–1406, 2006 WL 1933275, at

---

[2]The Act also contemplates a cause of action for retaliation after an individual asserts her rights under the Act. *Reed*, 782 F.3d at 337. In reviewing her original complaint, the Seventh Circuit found that Reed could maintain such a claim. *Id.*; *see also* (Docket #1). She omitted this claim from her amended complaint, however. She makes a retaliation claim only under the ADA. (Docket #37 ¶¶ 49–51). To the extent that the Court of Appeals generously construed Reed's original complaint, which she drafted on her own without the assistance of counsel, to contain a Rehabilitation Act retaliation claim, this Court cannot overlook that she and her counsel (which the Court recruited for her after remand) did not try to make such a claim in her amended complaint. In the end, the failure to plead the retaliation claim is immaterial, since it would fail for the same reasons as her existing Rehabilitation Act claims.

*3 (D. Conn. July 12, 2006) ("[O]ne of the few differences between the Rehabilitation Act and the [ADA] is the Rehabilitation Act's limitation to denial of benefits 'solely' by reason of disability, whereas the ADA covers situations in which discrimination on the basis of disability is one factor, but not the only factor, motivating an adverse employment action.") (internal quotation marks omitted).

Some decisions downplay this important distinction between the Rehabilitation Act and other, similar statutes like the ADA. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (calling a Rehabilitation Act claim "functionally identical" to an ADA claim); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). Others embrace it. *See Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002) ("Liability can only be found when the discrimination was 'solely by reason of her or his disability,' not when it is simply a 'motivating factor.'"). In a recent opinion, the Sixth Circuit, sitting *en banc*, addressed the issue squarely, finding that

> [the Rehabilitation Act] bars differential treatment "solely by reason of" an individual's disability; the [ADA] bars differential treatment "because of" the individual's disability. No matter the common history and shared goals of the two laws, they do not share the same text. Different words usually convey different meanings, and that is just the case here. A law establishing liability against employers who discriminate "because of" an employee's disability does not require the employee to show that the disability was the "sole" cause of the adverse employment action.

*Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 315–17 (6th Cir. 2012) (en banc). The Fourth Circuit has made the same observation: "Despite the overall similarity of [the ADA] and [the Rehabilitation Act], the language of these two statutory provisions regarding the causative link between

discrimination and adverse action is significantly dissimilar." *Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999); *see also McNely v. Ocala Star–Banner Corp.*, 99 F.3d 1068, 1073–77 (11th Cir. 1996).

Columbia does not challenge whether Reed is disabled, whether it knew of her disabilities, or whether it could have provided additional accommodations to her. Instead, Columbia argues that Reed cannot establish that it discriminated against her *solely* by reason of her disability. Reed alleges that, throughout her stay at Columbia, she was subjected to systematic discrimination because of her communication and personality disorders. Columbia asserts that its actions stemmed from the fact that Reed was an unruly, demanding, and uncooperative patient, not because of her disabilities.

The parties focus on Reed's encounter with Miller on the morning of March 11, 2012, and although there are certainly other aspects to her claims, March 11 is the focal point. Columbia presents the testimony of Miller and Fry that they placed Reed in seclusion that morning because of her disruptive behavior and refusing to follow instructions. Reed disagrees with their version of events, arguing instead that Miller overreacted to Reed's request for her Dynavox, her request to speak to her case manager, or her act of spilling coffee on herself. Critically, however, she admits that she spilled her coffee and thereafter fell to the floor screaming. She further concedes that Miller told her that she could not remain on the floor in the middle of the hallway. (Docket #55 ¶ 43).

These concessions are fatal to her claim. In the employment context, the Seventh Circuit has explained that

> [a]n employer may fire an employee for engaging in
> unacceptable workplace behavior without violating the ADA
> (or the Rehabilitation Act), even if the behavior was
> precipitated by a mental illness. The Rehabilitation Act protects

> qualified employees from discrimination 'solely by reason of' disability, meaning that if an employer fires an employee for any reason other than that she is disabled—"even if the reason is the consequence of the disability"—there has been no violation of the Rehabilitation Act.

*Brumfield v. City of Chicago*, 735 F.3d 619, 630–31 (7th Cir. 2013) (internal citations omitted) (quoting *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1196 (7th Cir. 1997)); *see also Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1052–53 (5th Cir. 1998) (employee could be fired for violent outbursts although precipitated by PTSD).

*Brumfield*'s reasoning applies directly to this case. It is undisputed that Reed fell to the floor screaming after spilling coffee on herself and that Miller instructed her that she could not remain on the floor. Assuming that the rest of her story is true—that Miller brusquely carried her to a seclusion room and left her there for two hours—it is indisputable that some portion of his conduct was motivated by a need to stop Reed from disturbing other patients and from laying on the floor. *Brumfield* teaches that even if Reed's spill and fall were a manifestation of her TD, the result was a nondiscriminatory basis on which Miller could act.

Additionally, because of the stringent causation standard applied to Rehabilitation Act claims, it does not matter whether Miller or Fry followed Columbia's procedures for secluding Reed—or indeed, whether Columbia had any appropriate procedures. The uncontroverted facts establish that Reed's disruptive conduct motivated their actions, and there the inquiry must end. *See Johnson*, 971 F.2d at 1493; *Soledad*, 304 F.3d at 505.

The same principle forecloses Reed's claims about the rest of Columbia's conduct during her stay. This includes: (1) Columbia's refusal to show Reed her medication records; (2) Columbia's refusal to allow Reed to

use the telephone; (3) Columbia's refusal to allow Reed to see a chaplain; (4) Columbia's refusal to allow her the use of her Dynavox at various times; and (5) her security escort at discharge. (Docket #37 ¶¶ 36–39). There is no dispute that throughout her time at Columbia, Reed engaged in loud, disruptive behaviors and that she was oftentimes uncooperative in her plan of care. She attributes her conduct to her TD and other disorders, but the fact remains that Columbia responded to her actions, not solely to her disabilities. It matters not whether those actions were precipitated by her disabilities. *Brumfield*, 735 F.3d at 630–31.

This Court's decision in *Rose*, which also involved a Rehabilitation Act claim, serves as a useful contrast. There, the plaintiff, who had HIV, was referred to a surgeon for removal of her gallbladder. *Rose*, 727 F. Supp. 2d at 734. She testified that when she met with the surgeon, he refused to operate on her because of the risk of exposure to her HIV. *Id.* The doctor proffered no other basis for his refusal other than her disease. *Id.* at 749. The Court found that a reasonable jury could conclude, based on this evidence, that the plaintiff suffered discrimination solely on the basis of her HIV. *Id.* at 748.

Unlike *Rose*, here Columbia has amassed a substantial body of evidence showing that Reed's conditions caused her to be loud, unruly, and uncooperative. Columbia's actions were motivated, at least in part, at controlling this behavior. For instance, although Reed complains that Fry unilaterally decided that she should not be given her Dynavox upon request, he did so because her behavior was poor. Even if he was wrong to deny her the machine for that reason, this undisputed evidence establishes that his actions were not based solely upon her disabilities. Likewise, assuming Columbia staff ignored Reed's warning that she was allergic to psychotropic medications, there is no evidence that this was done solely because of her

disabilities. The same goes for her allegations about being refused access to her medication records, the telephone, and the hospital chaplain, as well as her discharge escort. In short, she has not shown that Columbia's decisions in these instances were based only on stereotypes about her disabilities rather than on Reed's behavior. *Arline*, 480 U.S. at 287.

Viewed from the proper perspective, Reed's claims are, at best, for medical malpractice or violation of her Wisconsin statutory rights, not discrimination. The Rehabilitation Act, like the ADA, "does not create a remedy for medical malpractice." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996); *Grzan v. Charter Hosp. of N.W. Ind.*, 104 F.3d 116, 121, 123 (7th Cir. 1997), *abrogated on other grounds*, *Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871 (7th Cir. 2013). That Reed is disabled does not automatically make Columbia's alleged misconduct discriminatory. *Resel v. Fox*, 26 F. App'x 572, 577 (7th Cir. 2001); *see also Casimir v. Ill. Dep't of Public Aid*, 202 F.3d 272, 1999 WL 828601, at *2 (7th Cir. 1999) (whether plaintiff was wrongfully denied food stamps had nothing to do with his disability and was, at best, a possible violation of Illinois law, not the ADA). "[E]ven if the decision[s]" of Columbia's staff were "reprehensible and constituted malpractice," the Rehabilitation Act affords no remedy absent a showing that discrimination was the sole basis of the decisions. *McGugan v. Aldana-Bernier*, 752 F.3d 224, 232 (2d Cir. 2014).[3]

Because no reasonable factfinder could conclude that Columbia

---

[3]Reed relies heavily on the Court of Appeals' prior opinion in this case, but that reliance is misplaced. In reviewing Reed's initial complaint, the Seventh Circuit addressed Reed's allegation that she asked for her Dynavox and was then, without provocation, thrown into seclusion. *See Reed*, 782 F.3d at 337; (Docket #1 ¶¶ 10–11). The undisputed facts tell a different story, one that does not involve discrimination based solely on Reed's disabilities. *See id.* ("Whether evidence will support Reed's claim[s] is a question for later in the case.").

discriminated against Reed based solely on her disabilities, the Court is constrained to dismiss her Rehabilitation Act claims.

### 4.3    Supplemental Jurisdiction

The Court has dismissed each of Reed's claims arising under federal law. Because no federal claims remain in this case, there is a presumption that the Court will relinquish supplemental jurisdiction over her Wisconsin state-law claims. *See* 28 U.S.C. § 1367(c)(3) (a district court may decline to exercise supplemental jurisdiction over a state-law claim if it "has dismissed all claims over which it has original jurisdiction"); *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims."). The Seventh Circuit has identified certain circumstances that may overcome that presumption, including: (1) when the statute of limitations has run on the state-law claims, precluding the filing of a separate suit in state court; (2) when substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the state-law claims can be decided. *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009). Even when such circumstances are present, the decision to exercise supplemental jurisdiction is still committed to the Court's discretion. *Disher v. Info. Res., Inc.*, 873 F.2d 136, 140 (7th Cir. 1989).

Apparently confident that her federal claims would survive, Reed devotes no argument to why the Court should retain jurisdiction over her state-law claims. On this basis alone, the Court could find that the presumption in favor of dismissal has not been rebutted. Nevertheless, the Court's independent consideration of the factors from *Sharp Electronics* also

adequately demonstrates that dismissal is appropriate. First, the parties have not cited and the Court has not located definitive authority on which statute of limitations applies to her Wisconsin Mental Health Act claims, so it cannot say that a later attempt to file those claims in a Wisconsin court will be barred.

Further, although substantial time and resources have been committed to this litigation thus far, the Court has not considered the merits of the state-law claims. Those claims arise under a unique statutory scheme designed to protect certain rights of medical patients. *See* Wis. Stat. § 51.61. Such claims are quite different from Reed's federal disability discrimination claims in scope, purpose, and substantive standards. Thus, the effort spent deciding the federal claims does not translate usefully to the state-law claims. *See RWJ Mgmt. Co., Inc. v. BP Prods. N.A., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012). Moreover, the law as it relates to the Wisconsin claims has not been briefed, so the Court cannot discern whether the record is sufficiently developed to adjudicate them.

Additionally, the mere fact that this case is close to its trial date is not enough to require retention of jurisdiction. *Id.* at 481–82. Nor is the case's age dispositive; although this action is over two years old, it should be noted that nine months of its life was spent on appeal to the Seventh Circuit. *Compare id.* at 481 (affirming decision to decline supplemental jurisdiction in 15-month-old case), *with Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors*, 273 F.3d 722, 726 (7th Cir. 2001) (reversing decision to decline supplemental jurisdiction where case was five years old). Since it does not appear that any circumstances exist warranting the continued exercise of jurisdiction over Reed's state-law claims, those claims will be dismissed without prejudice.

**5. CONCLUSION**

As detailed above, Columbia enjoys immunity from the requirements of Title III of the ADA under the statute's religious exemption. All of Reed's ADA claims must, therefore, be dismissed. Further, the undisputed facts show that Columbia's alleged mistreatment of Reed during her stay in March 2012 was not premised solely on Reed's disability. Consequently, she cannot maintain claims under the Rehabilitation Act. Finally, as no claims arising under federal law remain in this case, the Court will exercise its discretion to dismiss Reed's state-law claims without prejudice.

Accordingly,

**IT IS ORDERED** that Defendant Columbia St. Mary's Hospital's motion for summary judgment (Docket #49) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Linda Reed's motion to strike Columbia's motion for summary judgment (Docket #51) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff Linda Reed's motion to restrict documents (Docket #53) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Linda Reed's motion to strike Columbia's religious exemption defense (Docket #54) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff Linda Reed's first, second, third, fourth, and fifth claims in her First Amended Complaint (Docket #37), arising under the ADA and the Rehabilitation Act, be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that Plaintiff Linda Reed's sixth, seventh, and eighth claims in her First Amended Complaint (Docket #37), arising

under the Wisconsin Mental Health Act, be and the same are hereby **DISMISSED without prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of February, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge